**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X

**MEERA PATEL,**                                                            Case No. 22 CV 3840 (LGS)

                                                            Plaintiff,                    **COMPLAINT**


                        -against-                                          *Jury Trial Demanded*


**COTA INC.,**
**INSPERITY PEO SERVICES, L.P., and**
**KAELEIGH FARRISH,**


                                                            **Defendants.**
-----------------------------------------------------------------------X

PLAINTIFF MEERA PATEL, by her attorneys, Goddard Law PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, New York 10006 alleges upon knowledge with respect to herself, and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.      Plaintiff brings this civil action against her former employers, COTA INC., INSPERITY PEO SERVICES, L.P., and KAELEIGH FARRISH to remedy unlawful gender/sex (female), race (South Asian), disability and/or perceived disability (mental health disability) discrimination, harassment, and retaliation, as well as failure to accommodate Plaintiff's disability in violation of the New York State Human Rights Law ("NYSHRL"), the New York City Human Rights Law ("NYCHRL"), 42 U.S.C. Section 1981 ("Section 1981"), and the New York State Equal Pay Act.

2.      Plaintiff seeks compensatory, emotional distress, and punitive damages against the Defendants, as well as attorney's fees related to the deprivation of Plaintiff's rights.

## JURY DEMAND

3.      Plaintiff demands a jury trial.

<u>**JURISDICTION AND VENUE**</u>

4.      This Court has subject matter jurisdiction over Plaintiff's Section 1981 claim and supplemental jurisdiction over her state law claims.  Defendants removed this case to federal court from New York State Supreme Court, County of New York, where it was commenced.

5.      Venue is proper in this district because Plaintiff was employed by Defendants in this district.

<u>**THE PARTIES**</u>

6.      Plaintiff Meera Patel ("Plaintiff") is a female citizen of the United States of South Asian descent who currently resides in New York, New York. Plaintiff suffers from a mental health disability.

7.      Plaintiff was, at all relevant times, COTA, Inc. ("Defendant COTA")'s "employee" within the meaning of all relevant State and local laws, including but not limited to the NYSHRL, the NYCHRL, Section 1981, and the New York State Equal Pay Act.

8.      Upon information and belief, at all relevant times, Defendant COTA was and is a foreign business corporation registered to do business in New York under the laws of the State and City of New York.  Upon information and belief, Defendant COTA's Operations Headquarters are located at 101 Arch Street, 15th Floor, Boston, Massachusetts 02110. At all relevant times, Plaintiff worked at Defendant COTA's business location at 100 Broadway, 7th Floor, New York, New York 10005.

9.      Plaintiff was, at all relevant times, INSPERITY PEO SERVICES, L.P. ("Defendant INSPERITY")'s "employee" within the meaning of all relevant State and local laws, including but not limited to the NYSHRL, the NYCHRL, Section 1981, and the New York State Equal Pay Act.

10.      Upon information and belief, at all relevant times, Defendant Insperity was and is a

business corporation registered to do business in New York under the laws of the State and City of New York. Upon information and belief, Defendant Insperity's Operations Headquarters are located at 19001 Crescent Springs Drive, Kingwood, Texas 77339.

11. Upon information and belief, at all relevant times, Defendant INSPERITY was and is an organization that provides off-site human resources and business solutions to small and medium-sized businesses, including to Defendant COTA. Upon information and belief, Defendant COTA hired Defendant INSPERITY to provide such services to its employees in or around 2014.

12. As Defendant INSPERITY admitted in its EEOC submissions, "by virtue of COTA's relationship with Insperity, Ms. Patel became co-employed by Insperity and COTA when she was hired by COTA."

13. Defendants COTA and INSPERITY are joint employers. As such, there are commonalities in hiring, firing, discipline, pay, insurance, records, and/or supervision.

14. While Defendant COTA set and/or controlled the hiring, firing, and other conditions of Plaintiff's employment, Defendant INSPERITY acted as Defendant COTA's Human Resources department, including issuing Defendant COTA's employees' paychecks and may thus be liable for discrimination and/or retaliation pursuant to the NYSHRL, the NYCHRL, Section 1981, and the New York State Equal Pay Act.

15. Upon information and belief, at all relevant times, Defendant Kaeleigh Farrish ("Defendant Director Farrish") was a Director of Operations and Delivery Services at Defendant COTA. Upon information and belief, Defendant Director Farrish is a white woman.

16. Upon information and belief, at all relevant times, Defendant Director Farrish worked at Defendant COTA's business offices at 101 Arch Street, Boston, Massachusetts 02110.

17. At relevant times, Defendant Director Farrish was Plaintiff's supervisor and/or had

supervisory authority over Plaintiff together with the ability to hire, fire, and/or affect the terms and conditions of Plaintiff's employment or to otherwise influence the decisionmaker of the same.

18. At relevant times, Defendants COTA, INSPERITY, and Director Farrish (collectively referred to as "Defendants") were Plaintiff's "employers" within the meaning of all relevant State and local laws, including but not limited to the NYSHRL, the NYCHRL, Section 1981, and the New York State Equal Pay Act .

19. Plaintiff is and was, at all times relevant herein, Defendants' "employee" within the meaning of all relevant State and local laws, including but not limited to the NYSHRL, the NYCHRL, Section 1981, and the New York State Equal Pay Act.

## FACTUAL ALLEGATIONS

### Plaintiff Is Diagnosed with a Mental Health Disorder

20. Plaintiff is a medical doctor who completed her medical degree from the University of Queensland, in Australia, in 2017. She also holds a Bachelor of Arts in Biology from Reed College, in Oregon. In addition to her medical and biology degrees, Plaintiff has significant experience in oncology, software development, information engineering, and data analytics and visualization.

21. At all times relevant to this Complaint, Plaintiff suffered from a mental health disability caused by a serious trauma that she experienced before starting to work at Defendants. While working for Defendants, Plaintiff's ongoing treatment included working with a treatment team of a psychiatrist and a therapist to help her learn how to cope with the traumatic experience and to manage her triggers as when she was triggered, she felt severe anxiety, lost focus, could not stay organized, became anxious, and could not communicate clearly.

4

22. At all relevant times, Plaintiff was able to perform the essential functions of her job with or without a reasonable accommodation.

23. At all relevant times, Plaintiff had a "disability" as defined by the NYSHRL and the NYCHRL.

**Plaintiff Interviews and Begins Her Employment at Defendants**

24. In or around the summer of 2018, Plaintiff interviewed for a position in Defendant COTA's Operations and Delivery Department with Vivek Kumar, the Vice President of Operations and Delivery at Defendants ("VP Kumar").

25. Upon information and belief, Defendant COTA is an oncology data and analytics company that, according to its website, uses proprietary technology to organize data on cancer care that can be used to advance care and research. First and foremost, Defendant COTA earns its income, upon information and belief, from the Operations and Delivery Department acquiring clinical data from hospitals and other partners, and selling this data to pharmaceutical companies.

26. While interviewing with VP Kumar, Plaintiff was told repeatedly that her medical degree and data analysis experience made her "perfect" for a position at Defendants as they continued to grow. VP Kumar repeatedly stated that it was very difficult to find someone with both a medical degree and experience in data analysis, and that Plaintiff would be instrumental in improving the quality and time-to-delivery of the cancer care data that Defendants provided to pharmaceutical companies.

27. Plaintiff was extremely excited that she would be able to combine her special skills to advance the quality of cancer care to future patients at hospitals and medical centers.

28. After interviewing for several positions at various employers, Plaintiff told Defendants that she had a competing offer of employment from another employer.

29.     Ray Cloutier, Defendants' Senior Software Engineer ("Senior Engineer Cloutier") insisted that VP Kumar match and exceed Plaintiff's competing offer because, he stated, her medical degree would be "key" to improving the quality and the efficiency of the clinical data that Defendants needed to fulfill their multi-million-dollar contracts with pharmaceutical companies, which was Defendants' primary source of income.

30.     In or around July 2018, Plaintiff accepted a position at Defendant COTA and received an employment contract that stated that she would be filling the role of "Data Analyst Manager" on the Operations and Delivery team and that she would be reporting to VP Kumar. Plaintiff was extremely excited to work with VP Kumar because she believed that given his prior experience, he would mentor her and assist her growth and potential at Defendants as well as in the healthcare tech industry.

31.     Prior to her start date, however, Plaintiff was told that Kaeleigh Farrish, Director of Operations and Delivery Services ("Defendant Director Farrish"), who reported to VP Kumar, would be her supervisor and that Defendant Director Farrish would take the lead in integrating her into the company and Team and familiarizing her with its work as she was new to the industry.

32.     Plaintiff had not previously met with Defendant Director Farrish during the interview process.

33.     Plaintiff was surprised by this abrupt change in her reporting but trusted that Defendants would allow her to do what she was hired for.

34.     Plaintiff started work on the Operations and Delivery Team at Defendants on or about July 23, 2018. The team included three other Data Analysts, all of whom were men. None of the other Data Analysts were doctors or had any other clinical background.

35. Plaintiff learned soon after her hire that there was an exceptionally high turn-over for women of color at Defendants, whether from resignation because of discrimination or termination. Unsettled by this fact and the sudden change of her supervisor, Plaintiff still resolved to work hard in her new role, hoping Defendants would value her hard work and strong credentials.

36. Upon information and belief, Plaintiff was paid less than male and/or white employees at Defendants and/or was given more work for less pay than her white and/or male peers.

**Plaintiff Recognizes a Lack of Quality in the Pharma Information Sold by Defendants**

37. From her first day at work, Plaintiff noticed that Defendants' work was conducted with very little clinical input or oversight by persons who had knowledge and/or experience in the healthcare field or by medical doctors, such as Plaintiff, who could increase the quality of the data they provided to pharmaceutical companies.

38. Despite these drawbacks, Plaintiff was hoping that through her role she could make positive changes to how the organization operated. After all, she was specifically assured during the interview process by VP Kumar that she would be instrumental in helping Defendants grow due to her medical degree and experience in data analysis.

**Plaintiff is Underutilized and Assigned Mundane Administrative Tasks**

39. From the beginning of her employment, Plaintiff noticed that Defendant Director Farrish treated white and/or male employees better than non-white and/or female employees for no apparent reason.

40. By way of example, to Plaintiff's surprise, instead of assigning her tasks that utilized her medical degree and/or experience in data analysis, Defendant Director Farrish gave Plaintiff "assignments" that were purely administrative. Plaintiff was told to upload data and fill in

spreadsheets, which could be described as "data entry"—work that someone with significantly less credentials and experience could have done.

41. Plaintiff easily completed the work and routinely asked Defendant Director Farrish for more substantive work that engaged her clinical knowledge.

42. However, Plaintiff's requests for more substantive work were routinely denied Defendant Director Farrish. Upon information and belief, Defendant Director Farrish did not think that Plaintiff was capable of more substantive assignments, despite her significant credentials, because Plaintiff was a woman of color.

43. Plaintiff was upset to be denied the opportunity to perform the job she was hired to do but hoped that things would change and that Defendants would eventually use her for her intended role.

44. Shortly after her hire, employees in the Clinical Data Department started asking Plaintiff for assistance in their work because they were aware of her expertise in the area. Ever the hard worker, Plaintiff readily helped and advised the Clinical Data Department because she lacked substantive assignments of her own and wanted to help Defendants grow. It was obvious to Plaintiff while helping the Clinical Data Department that she could drastically improve the quality of data that Defendants were selling if allowed to perform the role she was hired to do.

**Defendant Director Farrish Provides a Startling Lack of Leadership to Plaintiff**
**<u>While Supporting the Male Data Analysts</u>**

45. During her employment at Defendants, Plaintiff was supposed to meet with Defendant Director Farrish for one-on-one weekly meetings, which were supposed to be especially crucial during the beginning of Plaintiff's employment to help bring her onboard.

46. However, Defendant Director Farrish rarely scheduled meetings with Plaintiff and, when they did meet, she did not give her substantive direction or feedback on her projects. Upon information and belief, Defendant Director Farrish met on a weekly basis with the male Data Analysts.

47. In or around the fall of 2018, Plaintiff informed Defendant Director Farrish that the Clinical Data Department was regularly asking her for help due to her experience and qualifications. Plaintiff explained that due to her medical degree and experience with data analysis, this was the work she should be doing instead of administrative tasks, and she reminded Defendant Director Farrish that this was in fact what she was hired to do.

48. Defendant Director Farrish, visibly annoyed, did not provide any guidance to Plaintiff and said the administrative assignments she was being given would not change.

**Defendant Director Farrish Picks on Plaintiff and Singles her out with Microaggressions**

49. During team meetings and daily scrum, Plaintiff noticed that Defendant Director Farrish regularly gave her male peers substantive encouragement and feedback but "picked on" Plaintiff.

50. Defendant Director Farrish frequently confronted Plaintiff, in front of her team, about mundane tasks that she had not yet completed, even though those tasks were not yet due, or could not yet be completed due to downstream dependencies that had yet to be completed, which was typical of project management. The male employees also had outstanding tasks for their projects that

had yet to be completed due to dependencies but were not confronted about such by Defendant Director Farrish.

51. Strangely, Defendant Director Farrish routinely showcased her "altruistic" deeds towards marginalized groups and often specifically commented on her interest in "helping Women of Color succeed in the workplace" since they are an especially disadvantaged group. Upon information and belief, Defendant Director Farrish was acting as though Plaintiff, the only woman of color on the team, needed some sort of special help to succeed and was not as capable of doing her job without help like her male peers.

52. However, despite her statements to the contrary, Defendant Director Farrish seemed to have no interest in "helping" Plaintiff, or any other women of color.

53. Defendant Director Farrish's extremely patronizing behavior towards Plaintiff was especially odd because Plaintiff was more qualified than her male counterparts on the team, and indeed more qualified than Defendant Director Farrish herself. Defendant Director Farrish has, upon information and belief, a bachelor's degree with a double major in Spanish and business administration while Plaintiff has a Bachelor's in biology and a medical degree. Additionally, Plaintiff is able to code in SQL, R, bash, and Python and use other developer tools such as GitHub, which were fundamental requirements of the role she was hired for, but Defendant Director Farrish lacked those skills. Given her qualifications, Plaintiff simply could not fathom why Defendant Director Farrish was made her direct supervisor.

54. Plaintiff repeatedly told Defendant Director Farrish that she had more room on her plate and could take on more work, especially more substantive work on various clinical projects in addition to the work she was already doing.

55.     Defendant Director Farrish repeatedly turned down her offers to provide more help with increasing frustration and told her that she was asked to do what Defendants needed her to do.

56.     Meanwhile, Plaintiff knew that she was being under-utilized given her experience as a medical doctor with data analysis skills and she knew that she could greatly contribute to the quality of data Defendants were supplying to clients.

## Plaintiff is Encouraged to Fulfill Her Role as a Doctor and Analytics Expert

57.     Naqi Khan, MD ("Dr. Khan") began to work as Vice President of Analytics for Defendants in or around October 2018 and upon learning that there was another MD with programming skills on staff, was interested in utilizing Plaintiff to improve the efficiency and quality of processes.

58.     Upon information and belief, Dr Khan recognized that Plaintiff was being severely underutilized by Defendants.

59.     In or around October 2018, Dr. Khan proposed that Plaintiff be involved in data mapping, a process in which data has a code assigned to it to allow it to be more easily consumed by computer software. This requires a clinical background, which Plaintiff possessed.

60.     Dr. Khan believed that many of the Defendants' clients have MDs on staff that would be especially impressed by this feature in any data delivered to them, likely a feature that no other competitor would be able to provide otherwise, thereby improving the Defendants' reputation, and ultimately increasing Defendants' revenue.

61.     After informing Defendant Director Farrish of the potential collaboration, Plaintiff began working with Dr. Khan on adding this feature to the data.

11

**Defendant Director Farrish Continues to Treat Plaintiff Differently**

62. Upon information and belief, Defendant Director Farrish was furious that Plaintiff was being encouraged to take on more substantial responsibilities and to utilize her credentials by others in the company, and so decided to escalate the discrimination against her.

63. In or around November 2018, Defendant Director Farrish confronted Plaintiff and belittlingly told her that another manager, Allison Marresca, the Manager of Clinical Data Operations ("Manager Marresca") had complained about Plaintiff's alleged lack of response to a matter.

64. Horrified, Plaintiff proactively approached Manager Marresca to inquire as to what she had done wrong and how she could improve for the future since all communications between them up until that point had been very pleasant. Manager Marresca seemed extremely confused and said that Defendant Director Farrish had "completely overreacted" to Plaintiff.

65. From that point forward, Defendant Director Farrish regularly informed Plaintiff admonishingly that other employees were allegedly complaining about her.

66. In the months that followed, Plaintiff noticed that Defendant Director Farrish treated Plaintiff differently than Michael Mulcahy, a white male employee who began at Defendants approximately four months after Plaintiff, ("Co-worker Mulcahy") and Keshava Dilwali, a South Asian male employee, ("Co-worker Dilwali") who began working at Defendants one month prior to Plaintiff.

67. In meetings, Defendant Director Farrish harshly criticized Plaintiff and embarrassed her in front of her colleagues but did not do so to Co-worker Mulcahy and Co-worker Dilwali. Defendant Director Farrish had very little direct involvement in project management, but she berated Plaintiff for incomplete tasks related to Plaintiff's projects that were not due to be started until weeks or months down the line and/or had dependencies on tasks that the Plaintiff was actively working on,

as is fundamental aspect of project management. Defendant Director Farrish did not do the same during team meetings with the other male co-workers.

68. Defendant Director Farrish micromanaged Plaintiff and nitpicked Plaintiff's work for mistakes, or simply fabricated mistakes if she could not find any, to then undermine Plaintiff with patronizing "advice." For example, on one occasion Defendant Director Farrish berated Plaintiff for not knowing how to "run a meeting," even though the meeting that Plaintiff ran went smoothly and no one else complained to her about it. Defendant Director Farrish refused to give specific criticism.

69. On another occasion in or around late 2018, Defendant Director Farrish bizarrely told Plaintiff that she spoke "too loudly" during meetings. Plaintiff was shocked as she knew that she spoke at a normal volume, she had never received such criticism before, and she knew Defendant Director Farrish would never criticize her white or male peers for their volume.

70. Beginning in or around January 2019, Defendant Director Farrish began obstructing Plaintiff's relationships with others by excluding her from meetings, including important meetings with vendors. Plaintiff was shocked to find that Defendant Director Farrish regularly excluded *only her* from meetings while inviting everyone else on the team besides Plaintiff.

**Defendant Director Farrish Blocks Plaintiff from Obtaining PTO but**
**Approves her Male Peers' PTO Requests**

71. Adding to the ways that Plaintiff was treated differently by her supervisor compared to white and/or male employees, on several occasions where Plaintiff requested paid time off ("PTO"), Defendant Director Farrish told Plaintiff that she could not approve it because Plaintiff would be "needed" for upcoming deliverables even though she was mostly assigned to mundane tasks.

13

72. However, Plaintiff knew that Defendant Director Farrish had approved multiple if not weeks of PTO for Co-worker Mulcahy and Co-worker Dilwali, though they had more substantive work assigned to them and at least as big of a workload as Plaintiff.

**Plaintiff Fills Out Her Self-Evaluation**

73. In or around late January 2019, in preparation for an annual performance review with Defendant Director Farrish, Plaintiff filled out a self-assessment. Plaintiff hoped that she would finally be properly utilized given her unique skills as a medical doctor with data analysis experience.

74. Given that she had completed all of her necessary projects with professionalism and had received nothing but positive feedback from her colleagues and superiors, she gave herself an "Advanced" rating, out of "Advanced," "Proficient," "Developing," and "Not Developed."

75. Plaintiff also expressed her disappointment in not reaching her true potential at Defendants given her advanced skills and wrote that her role at Defendants was not what she had thought it was going to be.

76. Plaintiff then sent her self-assessment to Defendant Director Farrish in preparation for their meeting.

**Plaintiff is Kept on Despite Mass Layoffs**

77. On or about February 6, 2019, Mike Doyle, the President and CEO at Defendant COTA ("CEO Doyle") and Joellen Hornig, the Senior Vice President of Human Resources, ("HR SVP Hornig") called a company-wide meeting to announce mass layoffs of employees and to announce the names of those who were laid off. CEO Doyle explained to those remaining that Defendants were forced to downsize, but also told those remaining that they were the "pick of the litter," in terms of what Defendants needed to regain traction in the market.

**<u>Defendant Director Farrish Gives Plaintiff a Shockingly False and Poor Performance Review</u>**

78.     On or about February 6, 2019, Plaintiff met with Defendant Director Farrish for her performance review.

79.     Defendant Director Farrish abruptly began the meeting by sarcastically and hostilely telling Plaintiff that she had "forgotten" to give her the correct assessment tool to use for her self-evaluation.

80.     Defendant Director Farrish then instructed Plaintiff to "take the lead" in directing the meeting as they went down the list of categories in her evaluation.

81.     Defendant Director Farrish showed Plaintiff the different assessment tool, and, to Plaintiff's shock, informed Plaintiff that she had rated her as "Developing" for most categories.

82.     When Plaintiff asked for the reasons for her poor ratings in each category, Defendant Director Farrish's proffered reasons were vague, subjective, and/or unfair.

83.     When Plaintiff pressed, again, for more details on why her performance was allegedly poor, Defendant Director Farrish stated patronizingly that perhaps Plaintiff was not "suited" for the start-up environment, because the types of tangible clarifications on performance indicators were "difficult to have" in such an "unstructured" setting.

84.     In one example, Defendant Director Farrish stated that Plaintiff did not respond "quickly enough" to email and inter-office messages, which was entirely false, as Plaintiff regularly responded to messages as soon as she received them and with at least the same speed as she noticed other employees respond to emails.

85.     Plaintiff also cited the incident in which she alleged that Manager Marresca had "complained" about her, though Manager Marresca herself had told Plaintiff that this was not true and that she simply was asking if she had completed a task.

15

86. Defendant Director Farrish said that VP Kumar "did not believe that [Plaintiff was] performing at a manager level." When Plaintiff asked for clarification and an elaboration on what VP Kumar meant by this, Defendant Director Farrish simply reiterated a matter-of-fact statement that Plaintiff was "not performing at a level that most would expect of a manager."

87. Most shockingly, Director Farrish told Plaintiff that Defendants did not have a need for her clinical and medical expertise.

88. Defendant Director Farrish told Plaintiff that she was not "managing" projects correctly, but in reality, Defendant Director Farrish had not given Plaintiff any specific feedback in relation to project management thus far.

89. Plaintiff was shocked that Defendant Director Farrish was "moving the goalposts," that is, not setting and/or defining Plaintiff's goals and then changing them abruptly and intentionally in order to ensure that she would ultimately never be able to meet Defendants' expectations.

90. Upon information and belief, Plaintiff received a poor performance evaluation because of her gender and/or race and would not have been targeted in this manner had she been male and/or white.

**Defendant Director Farrish's Discriminatory Treatment**
**Exacerbates Plaintiff's Mental Health Disability**

91. Plaintiff felt humiliated, upset, and mentally exhausted from the constant change in expectations and baseless criticisms by Defendant Director Farrish, which exacerbated her mental health disability to the point that she began to experience significant anxiety.

92. Plaintiff ended the meeting by stating to Defendant Director Farrish what she had intended to say when she prepared for the meeting—that she was disappointed that she had not reached her true potential at Defendants given her advanced skills, and stated that her role at

16

Defendants, essentially doing administrative data entry, was not what she had thought it was going to be.

93. Defendant Director Farrish stated angrily that Defendants currently had no other position for Plaintiff besides the position she was in. She then said that if Plaintiff wanted to stay at Defendants, they would have to "work closely together" on her "areas of failed performance," directly threatening Plaintiff's job. She also stated that Plaintiff would not receive her 10% bonus (amounting to approximately $13,000) because of her alleged "poor performance."

94. Defendant Director Farrish then began to aggressively pressure Plaintiff to tell her whether she would stay at the company and work on her alleged "poor performance" and asked Plaintiff to give her a "deadline" for when she would let her know whether Plaintiff would continue to work at Defendants and be required to "work with [Defendant Director Farrish] on the issues she had found."

95. Defendant Director Farrish was relentlessly demeaning and belittling in questioning Plaintiff who finally stated that she would decide whether she would stay at Defendants in one week and then left Defendant Director Farrish's office. Upon information and belief, Plaintiff would not have been targeted in this manner had she been male and/or white.

**VP Kumar is Positive and Encouraging About Plaintiff's Role at Defendants**

96. On or about February 7, 2019, the day after Plaintiff's performance review with Defendant Director Farrish, VP Kumar asked for a meeting with Plaintiff.

97. VP Kumar told Plaintiff ecstatically that he thought that a particular project she worked on the month prior went very well and that he had "no complaints" on how it was executed.

98. Plaintiff was thrilled with this positive feedback, although she was very confused because just the previous day, Defendant Director Farrish had said that VP Kumar "did not believe that [Plaintiff was] performing at a manager level."

99. VP Kumar then stated that he "heard" that Plaintiff was growing "bored" with the role she was currently in, presumably from Defendant Director Farrish.

100. Plaintiff told VP Kumar that there was a huge disconnect between herself and Defendant Director Farrish. VP Kumar then apologized for putting her in the position of being managed by Defendant Director Farrish. VP Kumar further told her that it did not make sense to have an MD being managed by Defendant Director Farrish.

101. VP Kumar told Plaintiff that he could move her to Defendants' "Analytics" department or, in the alternative, she should come up with a "dream" job description to see if such a position could be created for her. VP Kumar then stated that if that position could not be created for her, he would be happy to support her as she looked for opportunities elsewhere.

102. Plaintiff was so surprised and grateful for VP Kumar's support and expressed her appreciation. She told him that she did not want to leave Defendants because she had become attached to the people she worked with and that she would think about the options he had given her. Plaintiff felt optimistic about her future at Defendants and how she could learn and grow within the company.

### VP Kumar Turns on Plaintiff

103. On or about February 19, 2019, Plaintiff had a follow-up meeting with VP Kumar to continue their discussions on her future at the company.

104. As soon as Plaintiff sat down, however, she observed that VP Kumar's behavior and demeanor had completely changed in comparison to his demeanor during their February 7, 2019 meeting.

105. Plaintiff began to communicate to him her vision of her future at Defendants, but he immediately shut her down and suddenly told her that she could not be moved to another department.

106. VP Kumar made it clear, with visible frustration, that he was not willing to engage in a discussion with her anymore. Plaintiff felt humiliated and upset, because she did not understand his change in attitude from the previous meeting.

107. Plaintiff tried to bring up the fact that he had offered to move her to the Analytics department, and suddenly he refused to do so.

108. VP Kumar furiously stated that Plaintiff must "build trust" with Defendant Director Farrish rather than asked to be moved, but when Plaintiff asked him for details on how she could do so, he did not provide her with answers.

109. VP Kumar finally said, "If I took my COTA hat off for a second, I'm telling you as a friend to find a new job." He then repeated it a second time, as if to make sure that Plaintiff understood what he was saying. Upon information and belief, VP Kumar knew that Plaintiff's days at Defendants were numbered due to Defendant Director Farrish's sabotage and discrimination.

110. Plaintiff was shocked by the abrupt and dramatic change in VP Kumar's statements and demeanor, as he had been so supportive to her at their last meeting.

111. Upon information and belief, Defendant Director Farrish badmouthed Plaintiff to VP Kumar and/or went above his head and badmouthed Plaintiff to employees even more senior at the company than VP Kumar.

**Defendant Director Farrish Gaslights Plaintiff Yet Again**

112. On or about February 21, 2019, Plaintiff asked for another meeting with Defendant Director Farrish. She asked again for details on how she could improve her performance, and what the expectations were for a "manager level" employee.

113. Defendant Director Farrish said vaguely that expectations for a manager "depended on the company" an employee worked for. When Plaintiff pressed her again for details, she gave only vague answers, saying that a manager conducted "better project management." When Defendant Director Farrish gave one example of posting messages on the inter-office message board, Plaintiff asked her what a satisfactory message would be but Defendant Director Farrish again refused to give a specific answer.

114. Upon information and belief, Defendant Director Farrish could not give specific criticisms because Plaintiff's performance was excellent and she had only singled out Plaintiff because she is a woman of color.

**Defendants Dismiss Employees' Concerns Over Racial Diversity and Blatantly Reject the Need for Women of Color in Leadership Positions**

115. Immediately following her meeting with Defendant Director Farrish, on or about February 21, 2019, Defendants held a meeting concerning extremely poor reviews that Defendants received from former employees on the employer-review website "Glassdoor."

116. One person in the meeting brought up the fact that a lack of racial and ethnic diversity was frequently cited as a reason for a negative work environment.

117. Elizabeth Rushforth, the Chief Legal Officer at Defendants ("CLO Rushforth"), HR SVP Hornig, and Defendant Director Farrish made dismissive and ignorant comments about the need for people of color in leadership positions, making Plaintiff feel extremely uncomfortable.

118. When another employee stated that there were not any women of color in leadership positions, HR SVP Hornig shockingly stated: "We don't need 'that' because we already have Bernard Chien [Defendants' Chief Technology Officer] ("CTO Chien") in a leadership position," and he was a person of color.

119. The employee rebutted that statement by saying that CLO Chien was not a *woman* of color but CLO Rushforth rolled her eyes and said that it was "hard" to have that "kind" of representation in leadership positions.

120. CLO Rushforth then glared at Plaintiff as she said this, as if Plaintiff was responsible and therefore to blame for the reports of discrimination and a lack of diversity at Defendants. Upon information and belief, Plaintiff was targeted by management as one of the few women of color at Defendants.

121. Upon information and belief, CLO Rushforth had been internally investigated for racist statements she made and racially discriminatory behaviors in the workplace, and yet was permitted to remain in a leadership position at Defendants.

**Plaintiff's Co-worker, Another Woman of Color, Tells Plaintiff That
Defendant Director Farrish Treats Her Differently Too Because Of Her Race and Gender**

122. The next day, on or about February 22, 2019, Plaintiff had lunch with several of her colleagues.

123. Plaintiff's colleague who was a woman of color ("Jane Doe") told Plaintiff that she had never worked at a company that was as toxic to women of color as Defendants. She told Plaintiff that she had been "bullied" by leadership and revealed that Defendant Director Farrish had been bullying her. She said, however, that if she reported the bullying and discrimination, she was afraid she would lose her job.

124. Upon information and belief, Defendant Director Farrish also degraded and bullied Jane Doe because she was a woman of color, while, as per usual, celebrating white and/or male employees.

**Defendant Director Farrish and VP Kumar Again Falsely Accuse Plaintiff of Poor Performance and Pressure Her to Leave Defendants**

125. That same day as the lunch in which Jane Doe shared with Plaintiff the discrimination that she had also been experiencing by Defendant Director Farrish, Plaintiff had an in-person meeting with Defendant Director Farrish, and VP Kumar joined their meeting via videoconference.

126. Defendant Director Farrish and VP Kumar told Plaintiff plainly that Defendants "did not need" her medical and clinical experience, that she would be performing "only technical tasks," that she would not move departments but continue to be managed by Defendant Director Farrish, and that they would be "monitoring [her] closely."

127. After VP Kumar quickly left the videoconference, Defendant Director Farrish told Plaintiff that she would be imposing a "Performance Improvement Plan" ("PIP") on Plaintiff and that Plaintiff would have to create this PIP from scratch in an Excel spreadsheet.

128. She also stated that Plaintiff must keep the spreadsheet open on her computer desktop at all times and that she would be regularly visiting her desk to monitor her work.

129. Upon information and belief, Plaintiff would not have been placed on a PIP had she been white and/or male.

**Plaintiff is Told that she Needs to Learn to Respect her White Supervisor**

130. Defendant Director Farrish ended her meeting with Plaintiff by abruptly stating: "Women of color like you need to respect my authority." She then swiftly exited the room.

131. Plaintiff was shocked by this overtly racist statement and felt extremely uncomfortable and offended.

132. Plaintiff was also shocked at how strictly Defendant Director Farrish said she would be monitoring her performance, despite the fact that Defendant Director Farrish provided no specific criticisms other than telling Plaintiff to respect her white boss, not to mention the fact that no one else at Defendants had complained about her performance.

133. Plaintiff was baffled that she was being put on a PIP but then instructed to make her own PIP from scratch. Plaintiff had never heard of an employee at Defendants being put on a PIP and then being told to design *their own* PIP. Upon information and belief, a protocol existed at Defendants where if an employee was put on a PIP, the employee's supervisor was to work with HR in order to provide the employee with the specific aspects of performance that needed to be improved.

134. Upon information, this PIP was part of Defendant Director Farrish's plan to set Plaintiff up for termination.

**The Hostile Work Environment Perpetuated by Defendant Director Farrish Against
Plaintiff is Damaging to Her Mental Health**

135. After their February 22, 2019 meeting, Defendant Director Farrish continuously bullied and degraded Plaintiff, insisting furiously that she must start creating her PIP immediately.

136. When Plaintiff asked for a template for the PIP, Defendant Director Farrish refused to provide one. Yet again, upon information and belief, Defendant Director Farrish was trying to set Plaintiff up to fail.

137. Immediately after her meeting with Defendant Director Farrish, Plaintiff began to experience increased symptoms of her mental health disability including losing focus because she was disassociating from a painful situation and feeling physical manifestations of her mental health disability.

138. When Plaintiff told Co-worker Mulcahy about Defendant Director Farrish and VP Kumar's belittling and degrading behavior towards her and the fact that she had been put on a PIP, he expressed concern that Plaintiff was being "disrespected," and treated "differently" than the others on the team, including himself.

139. Upon information and belief, Co-worker Mulcahy was communicating to Plaintiff that he believed she was a victim of race and gender discrimination.

140. Plaintiff told Co-worker Mulcahy that she felt the same way.

### Plaintiff Experiences a Serious Mental Health Episode and Asks for a Reasonable Accommodation for Her Mental Disability

141. Given the continuous degrading, belittling, gaslighting, aggressive, and discriminatory acts against her as a woman of color perpetrated mostly by Defendant Director Farrish and VP Kumar, Plaintiff experienced an extremely serious mental health episode on or about February 24, 2019.

142. Specifically, Plaintiff was unable to sleep or eat and experienced debilitating anxiety and the physical manifestations of that anxiety, all symptoms of her mental health disability.

143. Plaintiff also began having difficulty communicating with others in the office, and experienced impulsive behavior, which was a symptom of her mental health disability.

144. Plaintiff sought immediate treatment from her therapist and neuropsychiatrist, who attempted to assist Plaintiff in dealing with this serious episode through talk therapy and medication.

145. Plaintiff also emailed Defendant Director Farrish, VP Kumar, and SVP Horning expressing the following:

> I have a medical condition that qualifies as a disability. I will need the next 3 days off to receive necessary treatment, after which I want to engage in the interactive process to have accommodations made.

146. On or about February 25, 2019, Plaintiff had not yet receive a response to her email, and thus sent a message to her team informing them that she would not be in the office that day.

147. That same day, Plaintiff emailed Defendant Director Farrish, VP Kumar, and HR SVP Hornig again to inform them about her disability and need for accommodation, but again did not receive a response:

Dear [HR SVP Hornig],

I have a mental health disorder caused by a serious trauma approximately 9 months ago. My ongoing treatment includes working with a treatment team to help me learn how to cope with the experience and to manage my triggers. When I am triggered, I lose focus, cannot stay organized, become anxious, and cannot communicate clearly.

While I am fully qualified for the Data Analyst position, I am experiencing difficulties in performing my job because Kaeleigh Farrish reminds me of my attacker and it triggers me. I am writing to request a change in supervision under the Americans with Disabilities Act (ADA) to allow me to perform my job duties.

I will also be able to provide medical documentation from my therapist and psychiatrist if it is needed. I look forward to discussing further with you.

**Defendants Suspends Plaintiff's Work Email and Messaging Accounts**

148. On or about February 26, 2019, Plaintiff noticed on her laptop computer that her corporate email account and messaging system had been suspended, and, shortly thereafter, her work computer had been "wiped" clean of data.

149. Plaintiff was utterly shocked that this occurred while she was on medical leave for a disability, and merely one day after she had requested a reasonable accommodation for that disability.

150. Plaintiff emailed HR SVP Hornig to ask why this had occurred, and HR SVP Hornig told her only that she would "not need" her accounts while she was on medical leave.

25

**Plaintiff Reiterates to SVP Hornig and CMO Dr. Norden That She Has a Mental Health Disability and Needs a Reasonable Accommodation**

151. Increasingly anxious by the way she was being treated by Defendants and triggered by the fact that her work accounts had been suspended and her laptop wiped clean without explanation, on or about February 26, 2019, Plaintiff emailed HR SVP Hornig and CMO Norden to both reiterate that she had a disability that required accommodation under the American with Disabilities Act and to request a reasonable accommodation.

152. Plaintiff also complained to HR SVP Hornig and CMO Norden that Defendant Director Farrish exhibited manipulative behaviors towards her, that she was obstructing her relationships with others by not including her in important meetings, and that she was engaging in negative behavioral patterns toward her, including being abnormally enraged, gaslighting her, and committing other harms against Plaintiff for no justifiable reason.

153. Plaintiff further reported that Defendant Director Farrish had misreported her performance to VP Kumar and VP of Operations Monica Matta and placed her on a bogus performance evaluation that not only harmed her professional relationships but was also destructive to her mental health. She also stated that she was making a good-faith effort to determine next steps with her employment at Defendants, but that due to her fragile mental health she did not have the capacity to endure a psychological battle with Defendant Director Farrish.

154. Plaintiff did not receive a response to this email.

**Plaintiff Requests a Leave of Absence Due to Her Disability**

155. On or about February 27, 2019, Plaintiff provided Defendants with a note from her neuropsychiatrist requesting a leave of absence due to her mental health disability. The note informed Defendants that the doctor was treating her for medication management and that she was seeing a therapist for management of her anxiety, a symptom of her mental health disability. Plaintiff's

doctor's note specifically stated that "[i]n the context of resurgence of disabling anxiety symptoms, please excuse [Plaintiff] from work responsibilities from 2/28/29 to 3/8/19" and that the doctor would "reassess [Plaintiff] on 3/8/19 to evaluate her ability to return to work."

156. Plaintiff was effectively asking for a reasonable accommodation in the form of time off to treat her disability.

157. Plaintiff did not receive a reply to this email.

**<u>Plaintiff is Terminated from Defendants</u>**

158. On or about February 28, 2019, merely one day after Plaintiff's request for a reasonable accommodation for her disability, HR SVP Hornig sent Plaintiff a termination letter via email.

159. Plaintiff immediately understood that she had been terminated for reasons that were directly related to her mental health disability, and, more specifically, for having requested a reasonable accommodation in relation to her disability.

160. Defendants not only refused to engage in an interactive dialogue concerning Plaintiff's request for a reasonable accommodation for her disability in order to ascertain the feasibility of accommodating her disability, but terminated Plaintiff because of her disability, race, and gender.

161. Upon information and belief, had a male and/or white employee requested a reasonable accommodation for a disability, they would not have been immediately terminated.

162. At all relevant times, Plaintiff was fully capable of performing her job duties. However, upon information and belief, Defendants preferred to have non-disabled, white, and/or male employees replace Plaintiff.

163. Shortly after her termination, in or around early March 2019, Plaintiff met with a former colleague ("Co-worker Jane Doe"). Co-worker Jane Doe, a Black woman, opened up to Plaintiff about the discrimination she endured at Defendants.

164. Specifically, Co-worker Jane Doe informed Plaintiff that in or around January 2019, CLO Rushforth and HR SVP Hoenig changed the reporting structure for multiple female employees of color and forced them to report to them, effectively demoting them. Co-worker Jane Doe also mentioned that an employee of East Asian descent resigned after HR SVP Hoenig reassigned her to report to her directly instead of reporting to the CEO of Defendant COTA as she had been doing until that point, effectively demoting her.

165. In or around March 2019, Plaintiff's former colleague Steve Spearman, Vice President of Information Security and Compliance ("VP Spearman"), reached out to her to meet.

166. When they met, Plaintiff and VP Spearman discussed the racist hostile work environment that Plaintiff was subjected to during her time at Defendants.

167. VP Spearman told Plaintiff that he recently had a call with CLO Rushforth who said incredibly racist things to him about non-white employees at Defendants.

168. In or around March 2019, Plaintiff also met with Ray Cloutier, Defendants' former Senior Software Engineer, who had recently left Defendants. Plaintiff discussed with him how terrible her experience had been at Defendants and Mr. Cloutier said that it was widely known that Defendant Director Farrish had a history of targeting female employees of color, including one female employee of color that Mr. Cloutier said Defendant Director Farrish "got her fired" in or around 2018.

169.    Plaintiff also met with another former female colleague of color ("Co-worker Jane Doe 2").

170.    Co-worker Jane Doe 2 reported to Plaintiff that she had been sexually harassed by Defendant COTA's CEO Michael Doyle in front of various colleagues and managers. Co-worker Jane Doe 2 did not give Plaintiff details about the sexual harassment itself, but told Plaintiff that she reported the sexual harassment internally and nothing was done about it.  Co-worker Jane Doe 2 appeared clearly very traumatized by the experience, and for that reason Plaintiff did not want to probe by asking her questions.

171.    Plaintiff was aghast to hear these reports of pervasive discrimination and harassment at Defendants, perpetuated by Defendant Director Farrish and other senior level employees. While not surprised, Plaintiff was disgusted that Defendants had done nothing about the racist work environment, despite it being widely known that women of color were often targeted and discriminated against.

### Defendants Retaliate Against Plaintiff by Sending a Cease and Desist Letter

172.    On or about March 13, 2019, as Plaintiff was still recovering from her traumatic termination from Defendants and the ensuing mental health issues that resulted, Plaintiff received a "cease and desist" letter from Defendants' attorneys alleging without basis that she authored social media posts to harass Defendant Director Farrish and Co-worker Shivam. Plaintiff was yet again traumatized by the discriminatory, harassing, and retaliatory behavior by Defendants.

### Plaintiff Informs Defendants That She is Filing an EEOC Charge

173.    On or about March 13, 2019, Plaintiff informed Defendants that she would be filing an EEOC Charge based on race, gender, and disability discrimination, as well as a failure to accommodate her disability. Her email to Defendants read as follows:

[HR SVP Hornig],

As a woman of color, I believe it is my obligation to speak up whenever I feel that I've been treated unfairly due to my gender, race, and/or color in order to prevent other women of color from enduring the same treatment. As a patient with an ongoing mental impairment, I also believe that anyone with any type of disability should receive the accommodations they need to be able to realize their true potential in the workplace.

In addition to myself, others at Cota have also reported to me that they feel that they have discriminated against for the same reasons, suggesting that this a systemic problem that warrants investigation. As a result, I regretfully inform you that I am filing EEOC charges for race, color, gender, and disability discrimination and for retaliation after requesting ADA accommodations for my disability.

Meera Patel

**Plaintiff Reports the Discrimination and Retaliation to Defendant INSPERITY**

174.    In or around April 2019, Plaintiff reported the discrimination and retaliation to Defendant INSPERITY's Human Resources Representatives Tina Gurski and Ryan Chani. Plaintiff hoped that by doing so she could prompt an investigation into Defendant Director Farrish and other racist managers working at Defendants and prevent other women of color from being targeted and harassed.

175.    In her email to Defendant INSPERITY's HR Representatives Tina Gurski and Ryan Chani, Plaintiff reported the following:

I was terminated from COTA, Inc on February 28th. On February 22, Kaeleigh Farrish, who was not meant to be my supervisor according to my contract, inappropriately placed me on a performance improvement plan and told me that "woman of color like you need to learn to respect my authority". […]

I believe Kaeleigh Farrish, Joellen Hoenig, and Chief Legal Officer Elizabeth Rushforth targeted me this way because I am a woman of color. Joellen and Elizabeth in particular failed to take my reports of discrimination seriously and investigate Kaeleigh Farrish because their own discriminatory views of woman of color and disabilities. It also does not seem anyone at COTA has investigated

the matter since and they have instead created a narrative where I am the aggressor rather than the victim. In fact, I received an email from their attorney with ridiculous allegations as a means to victimize me further long after I left the company.

Though I am no longer with the company I would like to know if getting Insperity involved is possible. It is important for me to have this situation thoroughly investigated because I do not want these three to harm other women of color now or in the future due to their sense of entitlement.

176. Plaintiff also sent Defendant INSPERITY a lengthy, detailed document with all her specific allegations of discrimination and retaliation.

177. The INSPERITY investigator assigned to Plaintiff's case attempted to investigate and resolve Plaintiff's complaint. However, upon information and belief, the INSPERITY investigator's efforts were stopped and obstructed by CLO Rushforth because she wished to retaliate against Plaintiff for reporting the discrimination and harassment.

178. Defendants knew or should have known of the discriminatory conduct and failed to take corrective measures within their control.

179. Plaintiff was offended, disturbed, humiliated, and embarrassed by the blatant discrimination and retaliation that he experienced by Defendants.

180. Defendants retaliated against Plaintiff because she objected to Defendants' discriminatory and unlawful conduct.

181. Defendants created a hostile work environment which unreasonably interfered with Plaintiff's ability to perform her job.

182. The above are just some of the ways that Defendants regularly and continually harassed, discriminated against, and retaliated against Plaintiff while employing Plaintiff.

183. Defendants treated Plaintiff this way solely due to Plaintiff's race, gender, and disability.

184. Defendants acted intentionally and intended to harm Plaintiff.

185. Defendants unlawfully discriminated against, retaliated against, humiliated, degraded, and belittled Plaintiff. As a result, Plaintiff suffers loss of rights, emotional distress, and loss of income.

186. As a result of the acts and conduct complained of herein, Plaintiff has suffered a loss of employment, income, the loss of a salary, loss of benefits, other compensation which such employment entails, special damages, and great inconvenience.

187. Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

188. Defendants acted maliciously, willfully, outrageously, and with full knowledge of the law.

189. As such, Plaintiff demands punitive damages as against all Defendants, jointly and severally.

**AS A FIRST CAUSE OF ACTION**
**DISCRIMINATION IN VIOLATION OF SECTION 1981**
**(Against All Defendants)**

190. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

191. Section 1981 states in relevant part as follows:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

32

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. §1981

192. Plaintiff, who is a South Asian woman, was discriminated against because of her race/color as provided under Section 1981 and has suffered damages as set forth herein.

193. Plaintiff was effectively denied full and equal benefit of all laws and immunities and contracts (expressed and implied) as an employee of Defendants.

194. Plaintiff was subjected to a racially hostile work environment and acts of unlawful discrimination and retaliation at Defendants by her supervisor Defendant Director Farrish.

195. As a result of the acts and conduct complained of herein, Plaintiff has suffered a loss of income, pecuniary losses, economic hardship, emotional pain, suffering, inconvenience, special damages, loss of enjoyment of life and other non-pecuniary losses.

196. Plaintiff is entitled to the maximum amount allowed under this law.

**AS A SECOND CAUSE OF ACTION**
**RETALIATION IN VIOLATION OF SECTION 1981**
**(Against All Defendants)**

197. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

198. By the acts and practices described above, Defendants retaliated against Plaintiff for his opposition to unlawful discrimination under Section 1981.

199. Plaintiff, who is a South Asian woman, was retaliated against because of her race/color as provided under Section 1981 and has suffered damages as set forth herein.

200. As a result of the acts and conduct complained of herein, Plaintiff has suffered a loss of income, pecuniary losses, economic hardship, emotional pain, suffering, inconvenience, special damages, loss of enjoyment of life and other non-pecuniary losses.

201.     Plaintiff is entitled to the maximum amount allowed under this law.

**AS A THIRD CAUSE OF ACTION**
**DISCRIMINATION IN VIOLATION OF THE NYSHRL**
**(Against All Defendants)**

202.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

203.     New York State Executive Law § 296 provides that, "1. It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's . . . race . . . color . . . sex, disability . . . to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

204.     Defendants discriminated against Plaintiff on the basis of her sex, race, and disability and subjected her to a hostile work environment that was permeated with racial and gender bias.

205.     Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendants' wrongful conduct.

206.     Defendants treated Plaintiff differently from and less preferably than similarly-situated male and/or white employees, and/or non-disabled employees.

207.     Defendants had no good faith business justification for their actions against Plaintiff.

208.     Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

209.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of this law.

## AS A FOURTH CAUSE OF ACTION
## RETALIATION IN VIOLATION OF THE NYSHRL
### (Against All Defendants)

210.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

211.     New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

212.     Defendants engaged in unlawful discriminatory practices in violation of the NYSHRL by discriminating against Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Defendants and because of her requests for reasonable accommodations for her mental disability.

213.     Defendants have violated this section as set forth herein.

214.     Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

215.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of this law.

## AS A FIFTH CAUSE OF ACTION
## AIDER AND ABETTOR LIABILITY UNDER THE NYSHRL
### (Against Individual Defendant Director Farrish)

216.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

35

217. New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

218. Individual Defendant Director Farrish engaged in unlawful discriminatory practices in violation of New York State Executive Law § 296(6) by aiding, abetting, inciting, compelling and coercing discriminatory and retaliatory conduct against Plaintiff.

219. Plaintiff was subjected to discriminatory and retaliatory actions, statements, and harassment by Defendant Director Farrish.

220. Defendant Director Farrish is liable for aiding and abetting the discriminatory and/or retaliatory conduct about which Plaintiff complains herein.

221. Defendant Director Farrish had no good faith business justification for her actions against Plaintiff.

222. As a result of Defendant Director Farrish's discriminatory and retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

223. As a result of the acts and conduct complained of herein, Plaintiff has suffered a loss of income, pecuniary losses, economic hardship, emotional pain, suffering, inconvenience, special damages, loss of enjoyment of life and other non-pecuniary losses.

224. Plaintiff is entitled to the maximum amount allowed under this law.

**AS A SIXTH CAUSE OF ACTION**
**DISCRIMINATION IN VIOLATION OF THE NYCHRL**

225. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

36

226. The <u>New York City Administrative Code</u> § 8-107(1) provides that "It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived . . . race . . . gender, disability . . . to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

227. Defendants discriminated against Plaintiff on the basis of her sex, race, and disability and subjected her to a hostile work environment that was permeated with racial and gender bias.

228. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendants' wrongful conduct.

229. Defendants treated Plaintiff differently from and less preferably than similarly-situated male and/or white employees, and/or non-disabled employees.

230. Defendants had no good faith business justification for their actions against Plaintiff.

231. Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

232. By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of this law.

**AS A SEVENTH CAUSE OF ACTION**
**RETALIATION UNDER THE NYCHRL**

233. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

234. The <u>New York City Administrative Code</u> § 8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discriminate against any person because such person has opposed any practices forbidden under this chapter. . ."

235. Defendants engaged in unlawful discriminatory practices in violation of New York City Administrative Code § 8-107(7) by discriminating against Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Defendants and and because of her requests for reasonable accommodations for her mental disability.

236. Defendants have violated this section as set forth herein.

237. Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

238. By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of this law.

**AS AN EIGHTH CAUSE OF ACTION**
**AIDER AND ABETTOR LIABILITY UNDER THE NYCHRL**
**(Against Individual Defendant Director Farrish)**

239. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

240. The <u>New York City Administrative Code</u> § 8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this chapter or attempt to do so."

241. Individual Defendant Director Farrish engaged in unlawful discriminatory practices in violation of the NYCHRL by aiding, abetting, inciting, compelling and coercing discriminatory and retaliatory conduct against Plaintiff.

242. Plaintiff was subjected to discriminatory and retaliatory actions, statements, and

harassment by Defendant Director Farrish.

243. Defendant Director Farrish is liable for aiding and abetting the discriminatory and/or retaliatory conduct about which Plaintiff complains herein.

244. Defendant Director Farrish had no good faith business justification for her actions against Plaintiff.

245. As a result of Defendant Director Farrish's discriminatory and retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

246. As a result of the acts and conduct complained of herein, Plaintiff has suffered a loss of income, pecuniary losses, economic hardship, emotional pain, suffering, inconvenience, special damages, loss of enjoyment of life and other non-pecuniary losses.

247. Plaintiff is entitled to the maximum amount allowed under this law.

**AS A NINTH CAUSE OF ACTION**
**UNEQUAL PAY IN VIOLATION THE NEW YORK STATE EQUAL PAY ACT**
**(Against All Defendants)**

248. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

249. At all relevant times, Plaintiff was an employee and Defendants were her employers within the meaning of Article 6 of the New York State Equal Pay Act, Labor Law §§ 190, et seq.

250. The acts and practices of the Defendants constitute discrimination against Plaintiff in violation of the New York State Equal Pay Act by unlawfully paying non-white employees and/or non-male employees less than white and/or male employees for work that required equal skill, effort, and responsibility.

251.    Defendants' violations of the New York State Equal Pay Act were willful, entitling plaintiff to liquidated damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests a judgment against Defendants as follows:

i.    Declaring that Defendants engaged in unlawful employment practices prohibited by Section 1981, the NYCHRL, the NYSHRL, and the New York State Equal Pay Act in that Defendants discriminated and retaliated against Plaintiff on the basis of her race, gender, and disability;

ii.    Awarding Plaintiff compensatory damages for mental, emotional, and physical injury, distress, pain and suffering, and injury to her reputation, liquidated, and punitive damages in an amount to be determined at trial but in any case, no less than $1,500,000.00;

iii.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

Dated: New York, New York
May 23, 2022

Respectfully submitted,

GODDARD LAW PLLC
*Attorney for Plaintiff*

By: _____/s/_____
Megan Goddard, Esq.
39 Broadway, Suite 1540
New York, NY 10006
Tel: (646) 504-8363
Fax: 212-473-8705
Megan@goddardlawnyc.com